FILED

2022 Apr-15  PM 12:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ELOISE D. TROTTER,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.: 2:20-cv-01760-MHH** |
| } | |
| **ANDREW SAUL, Commissioner of** } | |
| **the Social Security Administration,** } | |
| } | |
| **Defendant.** } | |
| } | |

## <u>MEMORANDUM OPINION</u>

Eloise D. Trotter seeks judicial review of a final adverse decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).  The Commissioner denied Ms. Trotter's claims for disability insurance benefits and supplemental security income.  For the reasons that follow, the Court will reverse the decision of the Commissioner and remand this matter for further proceedings.

## LEGAL STANDARD FOR DISABILITY UNDER THE SSA

To succeed in her administrative proceedings, Ms. Trotter had to prove that she is disabled.  *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013).  "A claimant is disabled if [she] is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to

result in death, or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin*, 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[1]

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

"The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

---

[1] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited March 15, 2022).

## ADMINISTRATIVE PROCEEDINGS

Ms. Trotter was born in 1965.  (Doc. 9-4, p. 2).  In 1993, she began receiving disability benefits based upon her diagnosis of mental retardation.  (Doc. 9-4, pp. 7-8).  In 1993, Ms. Trotter had a Full-Scale IQ score of 67 on a WAIS-R test.  (Doc. 9-8, p. 13).  For the next 17 years, Ms. Trotter received disability payments because the Commissioner determined that Ms. Trotter had not shown medical improvement.  Ms. Trotter's disability payments ended in 2010 because, at age 44, Ms. Trotter began earning too much money to qualify for benefits.  In 2010, she was let go from the cleaning job that she had held for two years at Brookwood Hospital.  (Doc. 9-3, p. 60; Doc. 9-8, p. 13; Doc. 9-9, p. 25).

On November 8, 2011, Ms. Trotter applied for disability insurance benefits and SSI.  (Doc. 9-4, pp. 2-3).  Ms. Trotter asserted that on February 1, 2010, she became unable to work because of her disabling condition of borderline intellectual functioning.  Ms. Trotter also reported a diagnosis of affective/mood disorders.  (Doc. 9-4, p. 2).  In support of her application, Ms. Trotter stated:  "I have no car.  I have no bank account.  I have no income, no resources.  My mother and daughter pay all the bills and buys the groceries.  I do no[t] receive food stamps."  (Doc. 9-6, p. 3).  She also reported that she did not have private, group, or government health insurance to cover the cost of medical care.  (Doc. 9-6, p. 4).

The Commissioner denied Ms. Trotter's claims on February 10, 2012, (Doc. 9-5, pp. 2-4), and Ms. Trotter requested a hearing before an ALJ, (Doc. 9-5, p. 14). Following Ms. Trotter's June 25, 2013 administrative hearing, (Doc. 9-3, p. 34), the ALJ issued an unfavorable decision on September 27, 2013, (Doc. 9-4, pp. 30-44). The Appeals Council granted Ms. Trotter's request for review of the ALJ's decision. The Appeals Council vacated the decision and remanded Ms. Trotter's application to the ALJ for consideration of Ms. Trotter's mental residual capacity. (Doc. 9-4, pp. 50-51).

The ALJ held a second hearing on July 14, 2015. (Doc. 9-9, p. 2). On August 18, 2015, the ALJ issued another unfavorable decision. (Doc. 9-3, pp. 14-28). The Appeals Council denied Ms. Trotter's request for review of this decision. (Doc. 9-3, pp. 2-4). Ms. Trotter challenged the decision in district court. On June 20, 2018, this Court remanded and instructed the ALJ to "examine whether Ms. Trotter met or equaled Listing 12.05C based on her intellectual functioning in combination with her other severe impairments." (Doc. 9-12, pp. 35-50); *Trotter v. Comm'r of Soc. Sec.*, 2018 WL 3046982, *6 (N.D. Ala. June 20, 2018).[2]

Meanwhile, on January 12, 2017, Ms. Trotter filed a new application for SSI benefits based on alleged arthritis and migraine headaches. (Doc. 9-11, p. 37). The Commissioner denied the new application on May 5, 2017. (Doc. 9-12, pp. 6-8).

---

[2] Judge Putnam, the judicial officer who issued the 2018 decision, has retired.

Ms. Trotter requested a hearing before an ALJ. (Doc. 9-12, p. 11). The Appeals Council asked the ALJ to consolidate the claim files for the 2011 and 2017 applications, to associate the evidence, and to issue a decision on the consolidated claims. (Doc. 9-11, p. 46). Ms. Trotter and her daughter, Shania Fisher, appeared for a hearing before the ALJ on September 18, 2019. (Doc. 9-10, p. 49). On December 2, 2019, the ALJ issued an unfavorable decision. (Doc. 9-10, pp. 17-40). The Appeals Council denied Ms. Trotter's request for review, (Doc. 9-10, pp. 2-4), making the Commissioner's decision final and a proper candidate for this Court's judicial review, *see* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Trotter's Medical Records*

Ms. Trotter's medical records are sparse. She does not have a treating physician or psychiatrist. Therefore, her medical records consist mostly of consultative examinations performed for purposes of her applications for disability benefits and records of emergency room visits.

On June 3, 2010, Dr. Chad Burski examined Ms. Trotter for a disability determination. (Doc. 9-8, p. 3). Ms. Trotter complained of headaches, back pain, and "slow learning." (Doc. 9-8, p. 3). Ms. Trotter reported that she began experiencing back pain in 2000 after a car accident. (Doc. 9-8, p. 3). Ms. Trotter explained that her back pain felt sharp and constant. (Doc. 9-8, p. 3). She reported

that standing aggravated her pain, and rest made her back feel better.  (Doc. 9-8, p. 3).  Ms. Trotter stated that she did not have other symptoms associated with her back pain, and she reported that she had not sought treatment for it.  (Doc. 9-8, p. 3).  Ms. Trotter stated that she had experienced headaches for five years, with a headache generally lasting for a few days.  (Doc. 9-8, p. 3).  Ms. Trotter reported that she had learning difficulties that limited her ability to work.  (Doc. 9-8, p. 3).

Dr. Burski explained that because Ms. Trotter did not provide medical treatment records for him to evaluate, his functional assessment was based on the physical exam that he performed.  (Doc. 9-8, pp. 3, 6).  Dr. Burski indicated that "[Ms. Trotter's] learning disability [was] hard to evaluate . . . and [that it] should be formally evaluated if needed for disability determination."  (Doc. 9-8, p. 6).

Dr. Burski wrote that Ms. Trotter was "able to accomplish her ADL's, ambulate and transfer herself.  She denie[d] the need for assistance with activities of daily living except intermittently need[ing] help getting out of bed."  (Doc. 9-8, p. 3).  Dr. Burski noted that Ms. Trotter was obese, but she easily got on and off the exam table and removed her shoes.  (Doc. 9-8, pp. 4-5).  Dr. Burski noted that Ms. Trotter's gait was normal and that she was able to "heel walk, toe walk and tandem gait without assistance.  She [was] able to squat and bend over."  (Doc. 9-8, p. 5).  Ms. Trotter's musculoskeletal examination indicated that her spinal curvature and

appearance were normal.  (Doc. 9-8, p. 5).  Ms. Trotter did not have increased tone or spasms, but she had lumbar paraspinal tenderness.  (Doc. 9-8, p. 5).

Dr. Burski opined that Ms. Trotter "could stand or walk for 8 hours with breaks every 30 minutes.  She could sit for more than 8 hours without frequent breaks.  An assistive device [was] not used.  She could frequently and occasionally carry 10 lbs.  No postural, manipulative or environmental limitations apply.  Driving restrictions [did] not seem to be warranted."  (Doc. 9-8, p. 6).

On January 7, 2012, Dr. Shabrez Tariq examined Ms. Trotter at MDSI Physician Services.  (Doc. 9-8, p. 8).  Ms. Trotter reported low back pain, a learning disability, and headaches.  (Doc. 9-8, p. 8).  Ms. Trotter reported that her back pain had persisted for six to seven years.  (Doc. 9-8, p. 8).  Ms. Trotter stated that her back pain was sharp, throbbing, and generally on her left side.  (Doc. 9-8, p. 8).  She indicated that the pain radiated to her leg with occasional numbness and tingling to her knee.  (Doc. 9-8, p. 8).  Ms. Trotter reported that she took over-the-counter medication, and she would lie down with a pillow under her back to treat her pain. (Doc. 9-8, p. 8).  Ms. Trotter indicated that she had not had surgery, injections, or physical therapy to treat her back pain.  (Doc. 9-8, p. 8).

Regarding her "difficulty in learning," Ms. Trotter mentioned to Dr. Tariq that she had been in special education throughout school.  (Doc. 9-8, p. 8).  Ms. Trotter felt that she could not read or "catch up with instructions."  (Doc. 9-8, p. 8).

Ms. Trotter complained of frequent headaches that produced a stabbing and throbbing pain. The headaches occurred twice a month and lasted from 30 minutes to one week. (Doc. 9-8, p. 8). Dr. Tariq indicated that Ms. Trotter did not experience nausea or vomiting with the headaches, but she sometimes had to go to the emergency room for pain medication. (Doc. 9-8, p. 8). Ms. Trotter reported that her headaches were induced by stress and anger. (Doc. 9-8, p. 8).

Dr. Tariq indicated that "[Ms. Trotter] is independent with her activities of daily living. She can cook but sometimes she forgets how to cook. She can wash her dishes. She can do vacuuming and mopping." (Doc. 9-8, p. 9). Dr. Tariq noted that Ms. Trotter,

> was able to walk to the examination room without assistance. She was sitting comfortably in the chair. She was able to get on and off the examination table without assistance. She was able to take her shoes off and then put them back on. There were no inconsistencies. [Ms. Trotter] was able to hear and understand normal conversation.

(Doc. 9-8, p. 9).

Dr. Tariq diagnosed Ms. Trotter with low back pain "with moderate tenderness in the left L4-5 facet joints with positive straight leg raising, possibly lumbosacral spondylosis versus lumbar radiculopathy," headaches, and a learning disability. (Doc. 9-8, p. 11).

In February of 2012, licensed clinical psychologist Dr. Cynthia Neville performed a psychological examination on Ms. Trotter. (Doc. 9-8, pp. 13-17). Ms.

Trotter told Dr. Neville that she had applied for disability benefits because of a mental disability and that mental retardation ran in her family. (Doc. 9-8, p. 13). Ms. Trotter also reported that she suffered from "chronic back pain and frequent headaches." (Doc. 9-8, p. 13). Dr. Neville indicated that Ms. Trotter was overweight; she weighed 210 pounds and was five feet five inches tall. (Doc. 9-8, p. 14). Ms. Trotter indicated that she did not have a primary care physician, that she used over-the-counter medications as needed, and that she had not received outpatient or inpatient care from a mental health professional. (Doc. 9-8, p. 13).

Ms. Trotter characterized herself as a "slow learner." (Doc. 9-8, p. 1). She explained that she was in special education and had repeated two grades, but she graduated from high school. (Doc. 9-8, pp. 13-14). Ms. Trotter reported that when she got upset, her body shook, and she felt short of breath. (Doc. 9-8, pp. 13, 15). Dr. Neville noted that Ms. Trotter did not report symptoms that would support a diagnosis of panic disorder or generalized anxiety disorder. (Doc. 9-8, p. 15). Ms. Trotter reported that she cried about twice a week when she was disappointed. (Doc. 9-8, pp. 13, 15). Ms. Trotter also reported difficulty falling asleep. She indicated that she would fall asleep around 3:00 a.m. (Doc. 9-8, p. 14). Dr. Neville noted that during their visit, Ms. Trotter was "mildly irritable and gave up easily at times." (Doc. 9-8, p. 14; *see also* Doc. 9-8, p. 15).

Ms. Trotter indicated that she was able to dress and groom herself independently, but she needed help with her socks because of her back pain. (Doc. 9-8, p. 16). Ms. Trotter indicated that she cooked and microwaved meals, did laundry, and shopped with her family for groceries. (Doc. 9-8, p. 16). Ms. Trotter reported that she did not have a driver's license. (Doc. 9-8, p. 16). Ms. Trotter stated that she did not attend religious services. (Doc. 9-8, p. 16).

Dr. Neville diagnosed Ms. Trotter with dysthymic disorder (late onset), borderline intellectual functioning, and back pain and headaches based on Ms. Trotter's reports of pain. (Doc. 9-8, pp. 15-16).[3] Dr. Neville opined that Ms. Trotter's depression "might improve if she were to engage in outpatient mental health treatment in the year ahead." (Doc. 9-8, p. 16). Dr. Neville stated that Ms. Trotter's intellectual level, which was moderately below average, "seemed unlikely to improve significantly" over the course of the year. (Doc. 9-8, p. 16). Dr. Neville indicated that she would need to administer an achievement test to determine whether Ms. Trotter qualified for a diagnosis of learning disorder. (Doc. 9-8, p. 16).

Given Ms. Trotter's intellectual level, Dr. Neville found that her "ability to understand, remember, and follow through with work instructions would probably be limited to a moderate degree." (Doc. 9-4, p. 5). Dr. Neville reported that Ms.

---

[3] Dr. Neville ruled out mental retardation based on Ms. Trotter's reported academic and work histories and her daily living skills. (Doc. 9-8, pp. 15-16). Dr. Neville noted that she was not qualified to evaluate Ms. Trotter's reported back pain and headaches. (Doc. 9-8, p. 16).

Trotter's ability to interact appropriately with coworkers and supervisors or to handle typical work pressures "might be negatively impacted by her symptoms of agitated depression to a mild degree."  (Doc. 9-4, p. 5; 9-8, p. 16).  Dr. Neville believed that Ms. Trotter was capable of handling her own finances.  (Doc. 9-8, p. 16).

On February 5, 2013, Ms. Trotter sought treatment in the Emergency Department of St. Vincent's Hospital in Birmingham.  (Doc. 9-8, p. 60).  Ms. Trotter complained of right knee pain triggered by a car accident earlier in the week.  (Doc. 9-8, p. 60).  Ms. Trotter told Dr. Thomson, the attending physician, that she was taking 550 mg of naproxen sodium (Aleve) twice a day for pain.  (Doc. 9-8, pp. 60-61).  Ms. Trotter suspected that she had hit her knee on the dashboard during the accident.  (Doc. 9-8, p. 61).  She reported that her knee pain was worse with movement, but she stated that she was able to walk after the accident.  (Doc. 9-8, p. 61).  Dr. Thomson indicated that Ms. Trotter had significant swelling and tenderness in her right knee.  (Doc. 9-8, p. 62).  An x-ray revealed no fracture.  (Doc. 9-8, p. 63).  Dr. Thomson applied a splint and ace bandage to Ms. Trotter's knee and instructed Ms. Trotter to keep the knee elevated.  (Doc. 9-8, p. 62).  Dr. Thomson instructed Ms. Trotter to follow up with her primary care physician or to return to the Emergency Department.  (Doc. 9-8, p. 63).

Days after her emergency room visit, Ms. Trotter visited Collins Chiropractic Center for treatment of her knee and back pain.  (Doc. 9-8, p. 50).  Dr. Gerald J. Collins wrote that Ms. Trotter complained of right leg pain and low back pain.  Based on a physical exam, Dr. Collins diagnosed Ms. Trotter "with a knee and lumbar strain and associated muscle spasms.  Treatment was for the purpose of reducing symptoms and rehabilitation of the injured areas."  (Doc. 9-8, p. 50).  Ms. Trotter's MRI showed tears of the medial meniscus with joint effusion and edema in her right knee.  (Doc. 9-8, p. 50).

Ms. Trotter received chiropractic treatment 37 times over a three-month period.  (Doc. 9-8, pp. 22-57).  On February 27, 2013, Ms. Trotter reported that she was sleeping better and that her pain was not as constant.  (Doc. 9-8, p. 46).  On March 1, 2013, Ms. Trotter returned and reported that a day earlier, her right knee had given out, causing her to hit her knee.  (Doc. 9-8, p. 48).  On March 11, 2013, Dr. Collins noted moderate improvement in Ms. Trotter's condition.  (Doc. 9-8, p. 49).  Ms. Trotter returned on March 25, 2013, and said she was "hurting and in a lot of pain but it [was] not as bad as it was originally."  (Doc. 9-8, p. 26).  At her visit on April 10, 2013, Ms. Trotter's main complaint was lower back pain that was bothering her badly.  (Doc. 9-8, p. 29).  On April 29, 2013, Ms. Trotter stated that her knee was not how it was before the accident.  (Doc. 9-8, p. 34).  Ms. Trotter returned to Collins Chiropractic Center on May 6, 2013, and reported that her right

knee gave out, causing her to fall down some stairs.  (Doc. 9-8, p. 33).  Ms. Trotter indicated that she took Tylenol and used a heated towel to treat the pain and swelling. (Doc. 9-8, p. 33).

Ms. Trotter visited St. Vincent's Emergency Department on August 20, 2014. (Doc. 9-15, p. 25).  Ms. Trotter complained of "right lower abdominal pain [that] radiat[ed] to right flank area since yesterday."  (Doc. 9-15, p. 27).  Ms. Trotter was not in acute distress, but her CT showed abnormal findings in the imaging of her breast and pelvis.  (Doc. 9-15, p. 33).  The radiologist indicated that there were "suspicious right breast densities" that required an outpatient mammogram, and there were "several punctate calcifications in the right pelvis."  (Doc. 9-15, p. 33). Ms. Trotter received prescriptions for hydrocodone-acetaminophen and naproxen for pain.  (Doc. 9-15, p. 3).  Ms. Trotter was discharged with instructions to see an OBGYN for a mammogram and a urologist for further evaluation.  (Doc. 9-15, p. 34).

On April 25, 2017, Dr. Dallas Russel examined Ms. Trotter at the request of Disability Determination Services.  (Doc. 9-15, p. 5).  Dr. Russell noted that there were "no available [medical] records."  (Doc. 9-15, p. 5).  Dr. Russell indicated that Ms. Trotter had multiple concerns, but her right knee pain was most prominent. (Doc. 9-15, p. 5).  Ms. Trotter reported that the pain in her right knee was constant. She rated the pain as 8/10.  (Doc. 9-15, p. 15).  Ms. Trotter reported that she rode in

motorized carts in stores, and she could not walk long distances or stand for long periods of time. (Doc. 9-15, p. 5). Ms. Trotter stated that her right foot would swell if she spent too much time on her feet. (Doc. 9-15, p. 5). Dr. Russell noted that Ms. Trotter used a knee brace and Motrin, Aleve, or Tylenol to help with pain. (Doc. 9-15, p. 5). Ms. Trotter stated that she had trouble carrying and lifting heavy objects and buttoning, tying, and picking up small objects with her right hand. (Doc. 9-15, pp. 5-6). Ms. Trotter reported that she had a sharp pain that went down her right arm, that her hand felt numb, and that she was losing the strength of her grip. (Doc. 9-15, p. 5).

Dr. Russell stated that "Ms. Trotter's situation is complicated by the fact that she has no doctor and no health insurance." (Doc. 9-15, p. 5). Ms. Trotter stated that "[s]he went to St. Vincent's emergency room one time when her knee was particularly bothering her but she could not afford the $200 they asked for." (Doc. 9-15, p. 5). Dr. Russell noted limited range of motion in Ms. Trotter's right hand and right knee. (Doc. 9-15, p. 6). Dr. Russell noted swelling and tenderness in Ms. Trotter's right hand and knee. (Doc. 9-15, p. 6). Dr. Russell diagnosed Ms. Trotter with bilateral knee pain, swelling and tenderness in her right foot and right calf, neck pain, right cervical radiculopathy, rare and episodic low back pain, difficulty using her right hand, Alopecia, migraine headache disorder, visual disturbance, and obesity. (Doc. 9-15, p. 7).

Dr. Russell provided a medical source statement, opining that,

> [Ms. Trotter's] [f]ine motor skills are abnormal.  Handling is abnormal.
> Fingering is abnormal.   Gripping is abnormal.   Feeling is normal.
> Overhead and forward reaching are abnormal.  The abnormalities are
> right sided.  Vision/hearing/speech are abnormal.  Speech and hearing
> are normal.  She needs prescription glasses and has poor near vision.
> [Ms. Trotter] would be sensitive to environmental exposures such as
> heat/cold/humidity/noise/vibration.    [She] would have difficulty
> carrying/lifting.  [She] would have difficulty pushing and pulling.
> There is difficulty with sitting.  There is difficulty with standing.  There
> is difficulty with walking.  Posture is normal.  There is trouble with
> climbing/stooping/bending/crawling/kneeling/crouching.

(Doc. 9-15, p. 7).

Ms. Trotter reported to UAB Hospital on September 16, 2018, complaining of chest pain that had lasted for two weeks.  Ms. Trotter complained that her chest pain had begun to radiate to her right arm.  (Doc. 9-15, p. 9).  Ms. Trotter was given sublingual nitroglycerin, but it did not improve her pain.  (Doc. 9-15, p. 9).  Ms. Trotter was admitted "for observation and to rule out cardiac ischemia."  (Doc. 9-15, p. 9).  An EKG showed no concerning or abnormal findings.  (Doc. 9-15, p. 10).  Ms. Trotter was diagnosed with atypical chest pain, hypertension, and hyperlipidemia.  (Doc. 9-15, p. 10).  Ms. Trotter was discharged with instructions to follow-up with a primary care physician and to start a heart-healthy, 4-gram sodium diet.  (Doc. 9-15, p. 10).

On December 27, 2018, Ms. Trotter returned to UAB Hospital complaining of left arm pain that went from her shoulder to her hand and that caused mild

swelling.  (Doc. 9-15, p. 19).  Ms. Trotter denied having an injury, shortness of breath, chest or abdominal pain, fever, chills, or sweats.  (Doc. 9-15, p. 19).  After a Toradol shot, Ms. Trotter's pain decreased, and the treating physician found her stable for discharge.  (Doc. 9-15, p. 22).  Ms. Trotter received a prescription for cyclobenzaprine, and she was instructed to follow up with a primary care physician. (Doc. 9-15, p. 22).[4]

### Ms. Trotter's Administrative Hearings

On June 25, 2013, Ms. Trotter appeared for an administrative hearing.  (Doc. 9-3, pp. 34, 41).  When asked why she was unable to work, Ms. Trotter stated that she had "arthritis and fluid and stuff in [her] leg and it constantly bother[ed] [her] at night" making it difficult for her to sleep.  (Doc. 9-3, p. 41).  Ms. Trotter testified that she could not stand for long.  (Doc. 9-3, p. 41).  Ms. Trotter rated her knee pain as ten before and around the time of the car accident, but she testified that on an average day, her knee pain was a level six or seven.  (Doc. 9-3, p. 46).  Ms. Trotter stated that going to the chiropractor sometimes made her pain better.  (Doc. 9-3, p. 46).  Ms. Trotter indicated that she visited the chiropractor as a part of the settlement from the car accident.  (Doc. 9-3, pp. 43-44).  Ms. Trotter also stated that the

---

[4] Cyclobenzaprine is used to help relax muscles and relieve pain, stiffness, and discomfort caused by injuries to a muscle.  https://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/side-effects/drg-20063236?p=1#:~:text=Cyclobenzaprine%20is%20used%20to%20help,or%20injuries%20to%20your%20muscles (last visited March 27, 2022).

insurance carrier from the car accident sent her to the Bone and Joint Clinic.  (Doc. 9-3, p. 47).  Ms. Trotter testified that she had not sought medical attention for her knee pain before because she did not have Medicaid or insurance.  (Doc. 9-3, p. 43).

Ms. Trotter testified that her lower back pain interfered with her ability to work.  (Doc. 9-3, p. 41).  Ms. Trotter stated that her back pain was usually a level ten, but the pain fell to a five after she took Aleve or Ibuprofen.  (Doc. 9-3, p. 49). Regarding her mental health, Ms. Trotter testified that she had symptoms of depression.  (Doc. 9-3, p. 52).  Ms. Trotter testified that she got upset and cried. (Doc. 9-3, p. 52).  Ms. Trotter stated that she had had symptoms of depression since high school.  (Doc. 9-3, p. 53).  Ms. Trotter testified that she had not seen a counselor or taken medication for depression.  (Doc. 9-3, p. 53).

Ms. Trotter testified that she did chores around her home daily.  (Doc. 9-3, p. 54).  During the day, she watched TV or made a sandwich.  (Doc. 9-3, p. 54).  When asked about her education, Ms. Trotter testified that she attended Lawson State Community College where she took classes to become a nurse's assistant.  Ms. Trotter indicated that she completed the program, but she could not get a job because she could not pass the exams.  (Doc. 9-3, pp. 55-58).

Pursuant to the Appeals Council's remand, Ms. Trotter attended a second hearing on July 14, 2015.  (Doc. 9-9, pp. 2, 4).  Ms. Trotter testified that she had not received mental health treatment since her 2013 hearing, and she had not taken steps

to get mental health treatment since 2013 because she did not have insurance.  (Doc. 9-9, pp. 7, 10).  Ms. Trotter stated that the last time she went to the doctor, she was told that she needed $200 for a copayment.  (Doc. 9-9, p. 10).  Ms. Trotter testified that since the previous hearing, she had been more forgetful because of stress.  (Doc. 9-9, pp. 10-11).  Ms. Trotter testified that she had trouble reading, understanding, and organizing information.  (Doc. 9-9, pp. 16, 28).  She testified that she had to ask people to read for her and to explain what the information meant.  (Doc. 9-9, p. 28).  She stated that she took her driver's license test four times, but she failed each time.  (Doc. 9-9, p. 28).  She stated that either her daughter or her friend provided transportation when she needed it.  (Doc. 9-9, p. 28).  Ms. Trotter did not have an ID card because she had not yet saved the $25 needed to apply for the card.  (Doc. 9-9, p. 24).

Regarding her knee pain, Ms. Trotter testified that it was worse than before and that her feet swelled badly.  (Doc. 9-9, p. 7).  Ms. Trotter stated that she could not stand for long before she needed to sit down and elevate her feet.  (Doc. 9-9, p. 7).  Ms. Trotter stated that she did not seek treatment at Cooper Green Hospital because she had misplaced her ID card.  (Doc. 9-9, pp. 8, 10).  She did not continue her treatment with Dr. Collins because the insurance settlement ran out.  (Doc. 9-9, p. 26).  Ms. Trotter also testified that she usually sought medical treatment at St. Vincent's, but she did not have Medicaid or health insurance.  (Doc. 9-9, pp. 8-9,

26).  Ms. Trotter indicated that she took over-the-counter medications for pain. (Doc. 9-9, p. 9).

Ms. Trotter and her daughter, Shania Fisher, appeared for Ms. Trotter's third hearing on September 18, 2019.  (Doc. 9-10, p. 51).  The ALJ noted that Ms. Trotter was a "younger individual" when she filed her application in 2010, but she had changed age categories and, at 53, was approaching "advanced age."  (Doc. 9-10, p. 53).[5]  The ALJ noted that the district court, in its remand order, asked whether the ALJ should have done an assessment under 12.05 regarding intellectual disability given Ms. Trotter's IQ scores from 1993 and her ability to attend to tasks and to concentrate as it related to work.  (Doc. 9-10, p. 53).

Ms. Trotter's past work experience included day care worker, hospital cleaner, a housekeeper, and sales attendant.  (Doc. 9-10, p. 71).  Ms. Trotter testified that she did not have a driver's license, but she had gotten her ID.  (Doc. 9-10, p. 56).

Ms. Trotter testified that she had arthritis in her right hand.  (Doc. 9-10, p. 57). She stated that she dropped things and could not "hold any strength."  (Doc. 9-10, p. 57).  Ms. Trotter said that her arm hurt when she moved it, and she had to sleep with her arm off the bed to rest.  (Doc. 9-10, p. 57).  She testified that she wore an arm brace to "calm some of the nerve[s] down."  (Doc. 9-10, pp. 56-57).  Ms. Trotter stated that she had migraine headaches that caused her to see spots.  (Doc. 9-10, pp.

---

[5] Ms. Trotter's application was assigned to another ALJ for the 2019 hearing.

57-58).  Ms. Trotter testified that she had back pain.  (Doc. 9-10, p. 58).  She stated

that she needed help getting out of bed.  (Doc. 9-10, p. 58).  Ms. Trotter stated that

her feet and knee were painful and swollen.  (Doc. 9-10, p. 60).

Ms. Trotter testified that she had not had insurance in several years, but her

daughter helped her get Medicaid.  (Doc. 9-10, p. 62).  Ms. Trotter's daughter

testified that her mother qualified for Medicaid approximately six months before the

hearing.  (Doc. 9-10, p. 64).  Ms. Fisher testified that her mother visited Christ

Health, a free clinic, two or three times.  (Doc. 9-10, p. 64).  Ms. Fisher stated that

for the most part, Ms. Trotter received medical care in an emergency room.  (Doc.

9-10, p. 65).  Ms. Fisher indicated that transportation was a problem for their family.

(Doc. 9-10, p. 65).  She testified that she sometimes needed to borrow a car to take

her mother to the hospital.  (Doc. 9-10, p. 65).  Ms. Fisher stated that when her

mother was in pain, she applied Bengay and Biofreeze to the area and gave her over-

the-counter medications to help her get some relief.  (Doc. 9-10, p. 66).  Ms. Fisher

testified that when Ms. Trotter's pain became unbearable, she would take her to the

emergency room.  (Doc. 9-10, p. 66).

## THE ALJ'S DECISION

The ALJ found that Ms. Trotter had not engaged in substantial gainful activity

since February 24, 2010, the alleged onset date, and that she met the insured status

requirements of the Social Security Act through December 21, 2015.  (Doc. 9-10, p.

23).  The ALJ determined that Ms. Trotter had the severe impairments of obesity, arthritis and degenerative joint disease (DJD) in the right knee, learning disorder, dysthymic disorder, and borderline intellectual functioning.  (Doc. 9-10, p. 23).  The ALJ determined that Ms. Trotter suffered from the non-severe impairments of hypertension and hyperlipidemia.  (Doc. 9-10, p. 23).  Based on a review of the medical evidence, the ALJ concluded that Ms. Trotter did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 9-3, p. 25).

Given Ms. Trotter's impairments, the ALJ evaluated her residual functional capacity.  The ALJ determined that Ms. Trotter had the RFC to perform:

> medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except frequently climb ramps and stairs, but occasionally climb ladders, ropes, or scaffolds.  She can frequently balance, stoop, kneel, and crouch; occasionally crawl.  [Ms. Trotter] should avoid unprotected heights.  She can understand, remember, and carry out simple instructions for two hour periods and with normal breaks make up an 8-hour day.  [Ms. Trotter] can occasionally interact with others, including the public, co-workers, and supervisors.  Changes in her work setting should be infrequent or less than occasional.

(Doc. 9-10, pp. 30-31).  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, . . . she can also do sedentary and light work."  20 C.F.R. § 404.1567(c).  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though

the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). "If someone can do light work, . . . she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

Based on this RFC, the ALJ concluded that Ms. Trotter could perform her past relevant work as a cleaner as it is actually and generally performed. (Doc. 9-10, p. 38). Alternatively, relying on testimony from the vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Ms. Trotter could perform including dishwasher, cook helper, and floor waxer. (Doc. 9-10, pp. 39-40). The ALJ found also that Ms. Trotter could perform the light level jobs of housekeeper, bakery racker, and checker. (Doc. 9-10, p. 39 n.1). Accordingly, the ALJ determined that Ms. Trotter had not been disabled as defined

by the Social Security Act from February 24, 2010, through the date of the decision. (Doc. 9-10, p. 40).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  If a district court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### *The ALJ did not Perform a Complete Analysis at Step Three*

The ALJ who issued the most recent opinion in Ms. Trotter's case had a tall task.  He had to evaluate two applications for disability benefits and SSI spanning nearly a decade, and he had to account for instructions from this Court and from the Appeals Council.  Though Ms. Trotter's medical records are sparse, she has multiple impairments.   Ms. Trotter argues that in his December 2019 opinion, the ALJ overlooked relevant evidence in the administrative record, (Doc. 13); she is correct.

At step three, the ALJ did not include in Ms. Trotter's list of impairments headaches and arthritis/degenerative joint disease in her right hand.  (Doc. 9-10, p. 23).  With respect to headaches, the ALJ reasoned:

> [T]here were no headache allegations in the previous adjudications of this claim.  The claimant has neither complained of headaches nor received treatment for headaches from any primary care physician.  She has not been to the emergency room for headaches.  No treating healthcare provider has assessed her for migraine headaches.

(Doc. 9-10, p. 24).  The administrative record contradicts these findings.

First, Ms. Trotter's 2011 Title II and Title XVI applications concern mental impairments, and her 2017 applications concern her alleged physical impairments of arthritis and migraine headaches.  (Doc. 9-4, p. 2; Doc. 9-11, p. 37).  The Appeals Council instructed the ALJ to consider the 2011 and 2017 applications together.  (Doc. 9-11, p. 46).  Ms. Trotter did not complain of headaches to primary care physicians because she has not had a primary care physician since 2011, but her medical records contain consistent reports of headaches.  In 2010, she reported headaches lasting a few days.  (Doc. 9-8, p. 3).  She reported headaches again in 2012.  She described the headaches as stabbing pain that occurred two times each month and lasted from 30 minutes to one week.  (Doc. 9-8, p. 8).  Ms. Trotter reported to Dr. Tariq that she sometimes had to go to the emergency room to get pain medication for her headaches.  (Doc. 9-8, p. 8).  Ms. Trotter reported headaches again in 2012 to Dr. Neville.  (Doc. 9-8, p. 13).  In 2017, Dr. Russell diagnosed Ms. Trotter with migraine headache disorder.  (Doc. 9-15, p. 7).[6]

The ALJ similarly overlooked medical records concerning pain in Ms. Trotter's right hand.  During his 2017 examination of Ms. Trotter, Dr. Russell noted limited range of motion and swelling in Ms. Trotter's right hand.  (Doc. 9-15, p. 6).

---

[6] The ALJ stated that Dr. Russell's examination notes "are the only source that mentions headaches in the record."  (Doc. 9-10, p. 25).

Dr. Russell stated that Ms. Trotter was limited in her right hand in fine motor skills, fingering, gripping, and handling.  (Doc. 9-15, p. 7).  The ALJ's failure to consider these reported limitations makes vulnerable the ALJ's finding that Ms. Trotter can perform medium work because medium work requires frequent lifting of objects weighing up to 25 pounds.  The ALJ provided no limitations in Ms. Trotter's RFC to account for Dr. Russell's findings regarding the impairment in Ms. Trotter's right hand.[7]

Ms. Trotter also challenges the ALJ's findings with respect to Listing 12.05 concerning her alleged intellectual disability.  (Doc. 13, pp. 28-30).  In his 2018 decision regarding Ms. Trotter's 2011 applications, Judge Putnam directed the ALJ to consider Listing 12.05 because the Commissioner omitted that Listing when

---

[7] Relatedly, the Court notes that the ALJ stated that in 2017, Dr. Russell found that Ms. Trotter had a "slow gait and reduced range of motion in her right knee.  She could not squat, heel/toe walk, or tandem walk . . . ."  (Doc. 9-10, p. 30).  The ALJ's acknowledgement of Dr. Russell's examination findings makes the RFC finding that Ms. Trotter "can frequently balance, stoop, kneel, and crouch" vulnerable.  (Doc. 9-10, p. 30).

Elsewhere in his opinion, the ALJ stated that Dr. Russell found no pitting edema in Ms. Trotter's extremities and "range of motion was normal."  (Doc. 9-10, p. 34).  In fact, Dr. Russell found "2+ pitting edema of the right foot and calf with tenderness medial to the right lateral malleolus," and limited range of motion.  (Doc. 9-15, p. 6).

The ALJ assigned limited weight to Dr. Russell's opinion because after Ms. Trotter's date last insured, she had "no medical treatment besides emergency room visits," (Doc. 9-10, p. 35), but Dr. Russell explained that "Ms. Trotter's situation is complicated by the fact that she has no doctor and no health insurance," (Doc. 9-15, p. 5).  An ALJ errs if he discredits an examiner's opinion based on a claimant's "limited and conservative treatment" and failure to seek additional treatment without regard to her ability to pay for the treatment.  *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267-68 (11th Cir. 2015).

considering whether Ms. Trotter had an impairing intellectual disability.  *Trotter*, 2018 WL 3046982 at \*4.

Listing 12.05 changed on January 17, 2017, five days after Ms. Trotter filed her 2017 applications for SSI and disability insurance benefits.  (Doc. 9-10, p. 26; 9-11, p. 37).  "Amended Listing 12.05 simplified the four sets of criteria into two alternate criteria in subsections 12.05 (A) and (B).  20 C.F.R pt. 404, subpt. P, app. 1, 12.05."  *Dames v. Comm'r of Soc. Sec.*, 743 Fed. Appx. 370, 372 (11th Cir. 2018).  "When Listing 12.05 was amended, the Social Security Administration stated the amended rules 'will apply . . . to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date.'"  *Dames*, 743 Fed. Appx. at 372 (quoting Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,137, 66,138 (Sept. 26, 2016)).  "Upon receiving a case on remand, the Commissioner would apply the amended rules in its decisions." *Dames*, 743 Fed. Appx. at 372 n.2 (citing Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. at 66,138 n.1).  Therefore, because Ms. Trotter's 2011 applications were before the ALJ on remand and because Listing 12.05 changed after Ms. Trotter filed her 2017 applications but before the ALJ rendered his decision, the amended version of Listing 12.05 governed the ALJ's analysis of Ms. Trotter's intellectual disability.

Conducting analysis under the amended version of Listing 12.05, the ALJ found that Ms. Trotter does not meet the Listing because "there is no evidence establishing that [she] . . . had a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period."  (Doc. 9-10, p. 26).  The Court struggles to reconcile this conclusion with the Commissioner's determination that Ms. Trotter was disabled because of an intellectual disability between ages 27 and 44.  Indeed, this is the very reason that the Court remanded Ms. Trotter's 2011 applications for additional analysis.  *Trotter*, 2018 WL 3046982 at *4.  The ALJ based his conclusion on his finding that Ms. Trotter graduated high school, raised three children, cared for her grandchildren, earned a driver's license, earned a two-year nursing assistant degree, and worked at a hospital.  (Doc. 9-10, p. 26).

Ms. Trotter argues that the administrative record contradicts the ALJ's findings.  Ms. Trotter points out that she testified that from second grade onward, she was in special education classes, and she did not receive a diploma.  (Doc. 17, p. 3; *see also* Doc. 9-8, p. 13 (Ms. Trotter's report to Dr. Neville that she was not certain whether she graduated from high school or received a certificate of attendance).  Ms. Trotter testified that she could not read a menu at a restaurant, she had someone read articles in magazines to her, she had someone complete her disability applications and she signed them, and she had someone complete job

applications for her.  (Doc. 9-9, p. 16).[8]  Ms. Trotter's responsibilities at Brookwood

Hospital consisted of cleaning; she was not a nurse's assistant.  (Doc. 9-10, p. 71).

The evidence shows that Mr. Trotter could not pass the exams to become a nursing

assistant.  (Doc. 9-3, pp. 55-58).  The evidence concerning Ms. Trotter's ability to

drive is confusing.  With respect to her 2011 application for benefits, Ms. Trotter

indicated that she repeatedly failed the driving exam.  (Doc. 9-9, p. 28).  In her 2017

application, she indicated that she sometimes drove, but she had to have someone

with her because her knee would go out.  (Doc. 9-14, p. 49).

Examining most of this evidence in his 2018 opinion, Judge Putnam wrote:

> While the ALJ is permitted to consider evidence that is inconsistent
> with a finding of [intellectual disability], an ability to perform work for
> several years does not rebut mental retardation where "there is no
> evidence that [the job held is] beyond the reach of a mildly retarded
> individual." *Durham v. Apfel*, 34 F. Supp. 2d 1373, 1380 (N.D. Ga.
> 1998). Moreover, a finding that a claimant worked in the past, and even
> that a claimant could return to her past work, does not preclude an
> award of benefits where the claimant meets or equals a
> Listing. *Durham*, 34 F. Supp. 2d at 1381.

> In this case, Ms. Trotter has presented evidence of IQ scores that meet
> the 12.05C requirement, and those scores were accepted as valid by the
> Commissioner in 1993. Although a more recent examining physician
> described Ms. Trotter's intellectual functioning as "borderline," there
> is no indication in the record that any treating or examining physician
> disputed the validity of the IQ scores. Indeed, there is no indication in
> the record that Ms. Trotter has undergone additional IQ testing that

---

[8]The Court notes that the handwriting on Ms. Trotter's 2011 function report and her 2017 function
report differs significantly.  (*Compare* Doc. 9-7, pp. 50-57, *with* Doc. 9-14, pp. 43-57).

Ms. Trotter's daughter testified that she or her sister open Ms. Trotter's mail and read it for her or
review it with her.  (Doc. 9-10, pp. 63-64).

might dispute the 1993 scores. The IQ scores are supported by Ms. Trotter's history of special education courses, and the corroborated testimony that she can barely read, cannot write a check, failed a[] pre-employment test at Children's Hospital, and has never been able to pass a written driver's exam, despite repeated attempts. She became employed at Brookwood Hospital as a room cleaner only because no pre-employment test was required. The IQ scores are not supported by her own testimony that she received a certificate as a nursing assistant from a community college; however, she was never able to find employment in any position requiring those skills, and has worked only in cleaning hospital rooms and sitting with children in a day-care setting.

*Trotter*, 2018 WL 3046982 at *5 (footnote omitted).[9]   The ALJ seems to have

overlooked this analysis in Judge Putnam's opinion.

Significantly, in 2010, Dr. Burski stated that "[Ms. Trotter's] learning

disability [was] hard to evaluate . . . and [that it] should be formally evaluated if

needed for disability determination."   (Doc. 9-8, p. 6).   Similarly, Dr. Neville

indicated in her 2012 evaluation of Ms. Trotter that Ms. Trotter would need

achievement testing to determine whether Ms. Trotter "would qualify for the

diagnosis of a learning disorder."   Achievement testing is distinct from IQ testing.

*See, e.g.*,   https://strategicpsychology.com.au/difference-wisc-wiat/   (last   visited

---

[9] In *Trotter I*, Judge Putnam explained why he used the phrase "mental retardation" rather than the term "intellectual disability."  Judge Putnam stated:  "In August of 2013, the SSA amended Listing 12.05 and replaced the words 'mental retardation' with 'intellectual disability,' recognizing the pejorative  and  offensive  connotations  that  had  come  to  be  associated  with  the impairment. However, the change in terminology did not 'affect the actual medical definition of the disorder.' 78 Fed. Reg. 46,4999, 46,501. Because Ms. Trotter's application predates this change, the court uses the term 'mental retardation' rather than 'intellectual disability' to be consistent with the terminology of the Listing at the time of her application."  *Trotter*, 2018 WL 3046982 at *4 n.1.

April 13, 2022).  There is no evidence in the record that indicates that Ms. Trotter has received the testing that Dr. Burski and Dr. Neville indicated was necessary to assess Ms. Trotter's intellectual functioning.  Judge Putnam said as much in his 2018 opinion.  He pointed out that Dr. Neville's consulting examination "revolved around the application of Listings 12.02 and 12.04, but not 12.05C. (Tr. at 79-90). It Appears that there has never been a consultative examiner tasked with determining whether the plaintiff meets or medically equals Listing 12.05C." *Trotter*, 2018 WL 3046982, *5 n.4.  Thus, the ALJ has not adequately developed the record to conduct an analysis under Listing 12.05.  *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) ("The ALJ has a basic duty to develop a full and fair record. . . . [An] ALJ must 'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'") (quoting *Cowart v. Schweiker*, 662 F.3d 731, 735 (11th Cir. 1981)).[10]

Because of the errors at Step Three with respect to the administrative evidence and the ALJ's application of the law, especially the law of the case, the Court will remand this action for further proceedings.[11]

---

[10] At Ms. Trotter's administrative hearing in 2019, the ALJ was receptive to the notion of additional medical testing.  (Doc. 9-10, pp. 82-83).  The intelligence testing that two consulting physicians recommended did not seem to be part of the discussion about supplemental testing.

[11] "Generally, under the law of the case doctrine, an appellate court's findings of fact and conclusions of law are binding in all subsequent proceedings in the same case, whether in the trial court or on a later appeal. *See This That & the Other Gift & Tobacco, Inc. v. Cobb Cty.*, 439 F.3d 1275, 1283 (11th Cir. 2006)." *Zuniga v. Comm'r of Soc. Sec.*, 772 Fed. Appx. 870, 871 (11th Cir.

*Indigency*

Ms. Trotter contends that the ALJ erred because he did not "dig deeper and build a bridge connecting [Ms. Trotter's] impoverished condition and her lack of follow up care." (Doc. 13, p. 24). Though a remediable or controllable medical condition generally is not disabling, "poverty excuses noncompliance" with prescribed treatment. *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988). The burden of proving unjustified noncompliance is on the Commissioner. *Dawkins*, 848 F.2d at 1214 n.8.

The ALJ stated that Ms. Trotter "allege[d] debilitating symptomology and limitations associated with [her] alleged impairments, yet the evidence as a whole fails to confirm a disabling level of functional limitations caused by any physical or mental impairment." (Doc. 9-10, p. 32). The ALJ repeatedly indicated that Ms. Trotter was not credible because of her lack of treatment. For example, the ALJ stated:

> Despite alleging disabling pain, the claimant has infrequently sought treatment. Her main mode of treatment [was] through the emergency room. . . . [A] review of the medical evidence documents no medical treatment until 2013 despite an alleged onset date of 2010. She has not

2019). Relatedly, "[t]he mandate rule requires compliance on remand with the appellate court's instructions and forecloses relitigation of any issue that the appellate court expressly or impliedly decided. *See Johnson v. KeyBank Nat'l Ass'n ( In re Checking Account Overdraft Litig.)*, 754 F.3d 1290, 1296 (11th Cir. 2014)." *Zuniga*, 772 Fed. Appx. at 871. In *Zuniga*, the Eleventh Circuit stated that it did not have to decide whether either doctrine applies to Social Security appeals. *Zuniga*, 772 Fed. Appx. at 871. The record in this case supports application of both doctrines with respect to this Court's first decision concerning Ms. Trotter's 2011 Title II and Title XVI benefits applications.

had any treatment since 2013 other than an emergency room visit in 2014 and in 2018.  According to Ms. Fisher's testimony, the claimant was recently placed on Medicaid, but there is still no treatment other than emergency room visits.

(Doc. 9-10, p. 32).

In his discussion of Ms. Trotter's 2018 emergency room records, the ALJ pointed out that Ms. Trotter was told to follow-up with her primary care physician for hypertension and hyperlipidemia, but she did not follow-up and did not seek treatment from a cardiologist.  (Doc. 9-10, p. 23).  The ALJ noted that Ms. Trotter "has never taken any medication regularly.  She took medication prescribed at the emergency room visits, but she did not follow-up with any doctor to continue the medications."  (Doc. 9-10, pp. 33-34) (record citations omitted).  The paucity of records of treatment is a theme throughout the ALJ's opinion.

The administrative record contains ample evidence that Ms. Trotter could afford neither a primary care physician nor a specialist, and she could not afford to maintain her prescription medications.  Ms. Trotter stated at each of her three hearings that she did not have insurance.  (Doc. 9-3, p. 43; Doc. 9-9, p. 8; Doc. 9-10, pp. 67-68).  Ms. Trotter explained that she needed an ID to receive treatment from Cooper Green, but she could not afford to replace her lost ID.  (Doc. 9-9, pp. 8, 24).  She stated that she wanted to seek treatment at St. Vincent's emergency room, but the hospital asked for a two-hundred-dollar copay.  (Doc. 9-9, pp. 10-11; Doc. 9-10, p. 62).  At Ms. Trotter's third hearing, her daughter stated that she had

registered Ms. Trotter for Medicaid on the computer approximately six months before the hearing.  (Doc. 9-10, pp. 64-66).

Tellingly, when Ms. Trotter had funding through a settlement following a car accident, she attended 37 treatment sessions with a chiropractor over a three-month period.  (Doc. 9-8, pp. 22-57).  Though her pain was not resolved, the treatments ended when Ms. Trotter's settlement funds ran out.  (Doc. 9-3, pp. 43-44, 46-47; Doc. 9-10, p. 67).  Ms. Trotter wrote on her disability report, in the space allotted for recent medical treatment and medications, that she did not have insurance and that she needed it bad.  (Doc. 9-7, pp. 76-77).

On remand, the ALJ should determine whether Ms. Trotter's noncompliance with instructions from emergency room physicians and with prescription medication is a product of her poverty.

## CONCLUSION

For the reasons discussed above, the Court remands this case for further proceedings consistent with the analysis in this opinion and in Judge Putnam's opinion in *Trotter I*.

**DONE** and **ORDERED** this April 15, 2022.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE